May it please the Court, Kelly Sager for the appellants. I'd like to reserve five minutes for rebuttal, please. All right. As it was alluded to in the last discussion— This is Doe v. Gangland Products, Inc. That's correct, Your Honor. In the last argument, it was alluded to that in determining whether the SLAP statute applies to a particular case, the Court must start from the premise that the statute is to be interpreted and applied broadly. In contrast to the last discussion here, we have a lawsuit where every cause of action arises from the broadcast of a television program about a notorious street gang. Everyone, including the plaintiff, agrees that the topic of this program was a matter of substantial public interest. And everyone agrees that the plaintiff was connected to that topic. He's a former gang member. He was asked to be on the program because of his knowledge about this particular gang, and he was talking to the interviewers about that particular gang. Under this circumstance, there's no California court that has held that the SLAP statute does not apply, or that the plaintiff can somehow elude the SLAP statute by alleging that there was some kind of a promise about what would or would not be in the broadcast. And that makes sense, because if you allow a plaintiff to plead based on the content of the program that he was represented, it was represented to him that the program would say something or wouldn't say something, then every defamation case, every privacy case, creative plaintiffs will simply try to plead around the SLAP statute. Let's assume the SLAP statute does apply. Let's assume that your client is satisfied, step one, under the SLAP statute, and we get to the minimal merit, step two. Yes, Your Honor. What then? Then, Your Honor, first, if the Court reaches the merits, which we ask this Court to do, if the Court reaches the merits, the first claims are easy. The misappropriation claim that the plaintiff has pled was abandoned in the trial court. For that reason alone, this Court can find that the misappropriation claim should be found in favor of the defendants. In addition, even if you allow the plaintiff to argue it here when he did not do so below, it's based on an expressive work, and the law that we cited to the trial court and to this Court make clear that where you're talking about an expressive work, like a television program, you can't have a claim for misappropriation. The New Kids case out of this Court and the Daly case from the district court in the Northern District say that the First Amendment trumps the California misappropriation statute. The section of the statute 3344d, which we also cite in our papers below and cite to this Court, also make clear that when you're talking about a program that involves a matter of public affairs, that anyone who's in that program cannot sue for misappropriation. It's barred as a matter of statute. The Hilton case from this Court, the Ninth Circuit, said that almost all reporting of recent events, even though it involves publication of a purely private person's name or likeness, is exempt under 3344d. For that reason and the other reasons stated, the misappropriation claim should be found in favor of the defendants. Second, the claims for intentional and negligent infliction of emotional distress on their face as a matter of law, this Court should find for the defendants. The Uniform Single Publication Act on its face says that a plaintiff has one cause of action for tort based on the content of any kind of publication. I disagree with that interpretation of the single publication rule. As I read the single publication rule, it says you get damages and you get whatever cause of action, causes of action you can bring with respect to the first publication. When it's republished, you can't sue again, but it doesn't confine you to a single cause of action. Well, Your Honor, that is certainly the plaintiff's interpretation. That's mine, too. I appreciate that, Your Honor. There have been a couple of decisions in California courts, including the MG case, which we cite, and the Bow case from the Northern District, which have said that in addition to the statute of limitations provision, which does, as Your Honor suggests, talk about the first publication. It's not even a statute of limitations so much as it says republication no matter when they occur, even if they occur five minutes later, you only get damages arising out of the first publication. That's correct, Your Honor. But it also says that there is the plaintiff gets a single cause of action in tort. And MG and the Bow case both interpreted the statute as the way I indicated. I think that's just wrong, but okay. Thank you, Your Honor. You've got two other people who may agree with you. In addition, setting aside the Uniform Single Publication Act, the negligent infliction of an emotional distress claim is not a claim recognized as a separate tort under California law. So that claim should also be dismissed by this Court. You get then to the intentional infliction in privacy claims, and there's a dispute about whether the conduct here, putting the plaintiff's identity in this broadcast was sufficiently outrageous or an invasion of privacy to constitute a claim for either private facts or for intentional infliction of emotional distress. And it's hard to argue about this without getting somewhat into the release, but I would simply say that under the Shulman case, controlling authority under the California Supreme Court, they rejected a similar claim for invasion of privacy for private facts by using the identity of a woman who was in a terrible car accident and whose words, very private words to the medical nurse were broadcast. Yeah, but if we believe his story, and I understand it's disputed, so I'm not trying to resolve the disputed questions of fact. If we believe Mr. Doe's story, he said from the outset, I will be in danger if my name, face, identity are revealed during the course of this broadcast. And he says that the piece of paper given to him was represented to him as this is just an acknowledgment of the receipt. He says that he gave it to his girlfriend so she could read it because he is dyslexic and almost illiterate, and that the woman interpreting the interview said, oh, she doesn't need to read it because it's just a receipt. If we believe that, that release is fraudulently obtained and cannot release. So I'm treating this case for now, because of the disputed fact, as if there is no  And let me address the release, Your Honor. The one point I wanted to make on the privacy claim is there is no case before this Court where a court has said, setting aside whether there is or isn't a release, if they had simply done the broadcast and put Mr. Doe's name and face in it, there's no case that holds that that would satisfy his obligations for either an intentional infliction claim or an invasion of privacy claim. But you see, I don't think that's right, given his story. His story is he came voluntarily on the understanding that he would be protected and that the interviewer and the people who put this on the air knew very well that they were endangering him because of the murder of Mr. Miller that he was testifying about, because Mr. Miller had gone on TV and he'd been killed as a consequence. Under the circumstances here, if we believe his story, they knew they were putting him in danger. Actually, Your Honor, what the video shows, and the video is undisputed. There's no objection to the introduction of the video on authenticity grounds. There's no claim that the video doesn't accurately represent what Mr. Doe said during the interview. Mr. Doe makes clear several times during the outtakes that his friend was killed not simply because he spoke to the press, but for other reasons that he didn't want to describe, and that while he said, I am putting myself at risk by talking to you, he says that during the interview, but I'm not saying anything that's going to get me in trouble. So unlike my friend who was killed, I'm not doing the things he did. I'm talking to you, which could put me at risk, but I'm not saying anything bad, and he says that explicitly. He also says that the reason that he's doing it, he's glad he's talking to the producers, and the reason he's glad is because he thinks it's important to do things like talk to kids about gangs, to do programs like this where you're out there talking about why people shouldn't be in gangs. And he says, you get respect from the cops for doing this. And if you watch the outtakes, he gestures to the production staff and says, you do this, the cops respect you. They respect what I'm doing here. Well, they're paying him for it. They paid him, Your Honor. He's a confidential informant. That's how he's making his living. That is the allegation, Your Honor, that he's also an informant for the cops. But what he says in the outtakes is that the cops respect him for doing things like talking to the press about why you shouldn't be a gang member. And it sounds to me like all of those are arguments that you could potentially assert at trial, but given his allegations that the release was procured by fraud, it seems to me that those are questions reserved for the trier of fact. Why is that not so? Your Honor, for several reasons. Now, let me just start from the premise that there's not really a dispute that he signed it. That we have unequivocal evidence, and he simply says he doesn't remember exactly what he signed. And it's, I think, also undisputed that if the release is enforced, the lawsuit would be barred, all of the claims that the plaintiff brought. The alleged failure to read a document that you're given and asked to sign by a stranger, there's no dispute that this was a woman he'd spoken to for a few minutes. Then he shows up for the interview. So this is not someone that he has any kind of a personal relationship with. The failure to have read that document, or even if you're illiterate, the failure to have someone read it to you, and his girlfriend was there and could have read the the import of having signed that contract. That's a nice argument. He might win. He might not. But as a matter of law, Your Honor, the Hutchings case that's cited actually by the plaintiff, the Court said precisely that. But even an illiterate person signing a contract who says, I had no idea what I was signing, they can't avoid the consequence. No, he did have an idea of what he was signing. It turned out to be wrong. Again, believe in his story. He had a perfectly good idea as to what he was signing because she told him what he was signing. Well, according to the allegation, he was told it's simply a receipt. That's right. And if that's what she said, that strikes me as fraud. But, Your Honor. She might not have said it. I got that. Setting aside whether it was said or not, even assuming, assuming for purposes of this argument, that the producer said to him, it's just a receipt, sign it, the matter of law, it had to be reasonable reliance, not simply anything that someone has said to you, you can then rely on and say that it's fraud. Starting first with the premise that it's not good enough to say, so I didn't read it. If someone who's in an arm's-length transaction with you gives you something and says, don't bother reading that, you know, don't look at the man behind the screen here, simply trust me, that's not reasonable as a matter of law. And in the Hutchings case, as I said, that the plaintiff cites, that case they said you can't simply not read something and then claim you didn't know what was in it. And in the Rosenthal case from the California Supreme Court in 1996, the court said if a party has a reasonable opportunity and fails to learn the nature of the document he or she signs, such negligence precludes a finding that the contract is void for fraud in the execution. In other words, if I give you something and I say you can read it if you want to, but I'm just telling you don't bother, it's just a receipt, and you don't read it, the California Supreme Court said in the Rosenthal case you can't later claim that you were defrauded because you didn't bother to read the document that I handed you. You had an opportunity to read that. He had an opportunity to look at the document, which very clearly on his face is not a receipt. His position was that he was told, that the defendants told him that the document he was given, the sign was just a receipt. I appreciate that, Your Honor. He does say that. But the Rosenthal case, the California Supreme Court says that's not enough. If you don't have an opportunity to read it, that's something different. But if you unreasonably rely on someone's misrepresentation, that does not get you out of a contract you signed. Scalia, those are all factual questions. That goes to a jury. With due respect, Your Honor, that's not a factual question. It's unreasonable. I think it is. In the Hensley case, another case that we cite, this is a summary judgment case. So under Your Honor's theory, by the same token, a summary judgment case would be a disputed issue of fact.  So the defendant cannot reasonably rely on a representation made by somebody who's on an arm's-length transaction, not a fiduciary of some kind, based on an oral representation where the document itself expressly disputes what the representation supposedly was. You know, the standard under SLAP, when you get to Step 2, is minimal merit. That's correct, Your Honor. And if he has minimal merit in the sense of a plausible argument that might lose on the law. I'm not talking now facts. I'm talking law. If he has a plausible argument that has minimal merit, that somebody might disagree with your reading of the Rosenthal case, this case goes forward. With due respect, Your Honor, minimal merit doesn't mean that all he has to do is allege it. He has to have admissible evidence that would satisfy ---- You're putting words in my mouth. I'm not trying to do that, Your Honor. Believe me. My point is that that standard is like a reverse summary judgment standard. He has to have enough evidence to create a disputed issue of fact that entitles him to get to a jury. And that is the same standard as was applied in Hensley, the same standard that was applied by the California Supreme Court in Rosenthal. But it's not enough for him to say, well, you told me it was a receipt, so I didn't bother to read it. That doesn't get him past the obligation to be bound by the contract he signed. You're on that point. I disagree with you. Okay. Well, I'll go for two out of three then, Your Honor, because I ---- it's an important point when you look at the cases that even the plaintiff asked the Court to read. And if you look at all of the cases under the California Supreme Court authority, which is binding on this particular issue, the Court has said that you cannot simply willfully blind yourself to the contents of a document, despite what someone may or may not have told you. Talk to them. You're not talking to me. In the most recent articulation, the one that we presented to the Court ---- I'm going to have to go back and carefully read the facts in that case. And I appreciate that ---- It strikes me as wrong, your position. I appreciate that it is difficult because it's ---- the sympathy would be with someone who says that I was misled into signing something. But if I could appeal as well to the Court on the same issue, if you're in the position of the producer here who has a contract that is signed by a party, what the Court would otherwise be saying to a plaintiff is, all you have to do is lie. If you make up something that you say you were told before you signed this contract, you can avoid your obligations under that contract. Then written agreements are not respectfully worth the paper they're written on. If anyone can get around their obligations by saying I didn't read it or you told me it was something else and I signed it anyway, even though the document on its face makes very plain what it is, if that's the state of the law, then contracts have no meaning, because every plaintiff who wants to avoid their obligations is going to say, I didn't read it or you lied to me about what it was. And the California courts have tried to fashion a balance of these responsibilities, where if somebody has defrauded you into signing something under certain circumstances, then you may be able to get out of that contractual obligation. Now, the Rosenthal case talks about unreasonable reliance. So we have to get into what might constitute unreasonable reliance. Under the circumstances of this case, as described by Mr. Doe, I understand. Again, I'm not resolving the facts. He walks in with a bandana over his face. He makes it clear that he thinks that he will be in some danger if his name, face, identity are revealed. The woman who he has met in the company of a police officer whom he trusts says to him, don't worry. We would not endanger you, because we're not going to reveal your face and name. And here's something. This is just a receipt. In those circumstances, could a jury conclude that his reliance was reasonable? If, Your Honor, the jury also has in front of it a document that directly contradicts that, I don't think that the jury would have that. Well, no, the document is clearly a release. No, but the document can't contradict what I just said, because this is all narrative as to what led to the signing. The document can't contradict what I just said. Certainly. If all you have are those facts and nothing else happens, Your Honor, that's a different factual scenario than we have here. Under those circumstances where there is nothing more. But why is the scenario I've just given you wrong for purposes of what we now have in front of us? I've just described to you the story he told. But you've only described part of the story, Your Honor. And so what's the rest of the story that makes this reliance unreasonable? The rest of the story is that he then signs a document that says exactly the opposite. He then, despite having said, please keep me, my identity a secret, he then says, never mind, you have the right to put my identity in this broadcast. Well, you know, that's just nonsense. The question is whether he reasonably relied on her representation as to what was in the document. And now you're saying, but he signed the document that he didn't read, and that makes his reliance reasonable. I don't get it. Actually, Your Honor, there are two different representations the plaintiff claims were made to him. One was about whether they would keep his identity secret. The other was whether this document was a receipt or something else. He doesn't claim he signed the document based on the first alleged representation, that he somehow thought this document said the opposite, I promise to keep your identity secret. He doesn't say that. He says, she told me it was a receipt and I signed it. But under the law, that doesn't get him out of looking at that contract to say, no, it's actually, no one could reasonably look at this document and think it's a receipt. It says very plainly what it is, and it's clearly not a receipt because it's way too long to be a receipt. He had the opportunity to have it read to him. So that reliance on what this document is is not reasonable.  get around summary judgment or a slap motion by saying things that contradict his own statements, his own conduct, and his own admissions in the form of what he did on that videotape. He poses to have his picture taken, his face shown in these, in this video. He turns his eyes and turns his face to give the cameraman a better shot. He gives them still photos of his face. There's no explanation by the plaintiff's lawyer in any brief to the district court or this court as to why he would have done any of those things if he thought his face would never be shown. I'll reserve the balance of my time, Your Honor. Thank you. Thank you very much, Your Honors. Eric Schiffer on behalf of the plaintiff, John Doe. Your Honors, I wanted to address first what's been raised as far as the context of how this relationship came to be in the first place, because I think that's   lawyer. about the minimal merit prong of the slap statute. What we have here is a plaintiff who told, well, let me back up for a moment. There's not a lot of dispute between what plaintiff says in his declaration and what the interviewer says in her declaration. There are some key moments where it's a he said, she said, but the setup of how they met, the premise of how they met, what they were doing is fairly consistent. And I think because of that, it's important to note that the minimal merit prong has to be deemed to have been satisfied. He told the police, or he told the interviewer about his police informant activity. That was the whole premise of him even meeting her in the first place. As his declaration noted, she was talking to a police officer about a childhood friend of his who was a gang member who was also murdered. He came in a bandana. There's nothing disputing that in anything that is before this Court. He was told that what he was signing was a receipt. And most importantly, he wasn't given a copy of that document. There's no dispute to that or anything in this record. Based upon all of that. But help me understand, how did he sign it then if he wasn't given a copy? He signed it and gave it back to the interviewer. Oh, I see. You mean he wasn't given a copy afterwards. That's correct. And his declaration states he was told he would be sent one later along with a copy of what this was. He never was. So when you look at all of those facts put together, the minimal merit standard, as Your Honor indicated in the Mindy's Cosmetics case, does not weigh the credibility or the comparative probative strength of competing evidence. It only views the defendant's evidence to see it defeats plainness as a matter of law. And we would submit that it does not. So under Rosenthal counsel, if the signer of the contract does not know or has a reasonable opportunity to know of the essential terms of the contract, then essentially there's no effective manifestation of assent, I'm quoting from the language of Rosenthal here. And here you're saying that he didn't have a reasonable opportunity to know what was in the receipt because of the way it was presented to him and then taken away afterwards and never got a copy afterwards? That's correct, Your Honor. It's a combination of all of those things. It's being told ahead of time that his identity wouldn't be disclosed. It's being given something to sign when he told them he doesn't have the ability to read. It's being asking his girlfriend to look at it and having the interviewer say, well, it's just a receipt. Just go ahead and sign it. We'll send you a copy later. It's all of those things. And when Rosenthal plays into it, that can't be found to be assent to an agreement. And that would be our position on that, Your Honor. Moving back, if I might, Your Honors, to the first prong of the Slab statute, if you're inclined to look at that. Let me ask you one question before I forget, and then you can move back to the first prong if you'd like. But how do you construe the single publication rule? I agree with Judge Fletcher on that interpretation, I believe. What we've alleged is the single publication and how they are trying to say that somehow we're suing on repeated publications, we're not. We're suing on the initial publication. But are you limited to just choosing one tort claim, then? I don't believe we are, Your Honor. That's not how I read that rule. But it says no person shall have more than one cause of action for damages. Well. Arising out of any single publication or any one broadcast. Right. But I don't know if a cause of action plays into a variety of accounts. Arising from that cause of action, I think there can be a distinguished moment there. If you're limited to one tort claim under the single publication rule. Correct. If that's the case, Your Honor, and we get to that point, we'd be happy to designate the tort we want to proceed on if that's the procedural issue that's presented. But from a Slab standpoint, which is what we're here to discuss, I don't think that bars any of these claims as a matter of law. Moving back, if I might, Your Honors, to Judge Guilford's district court opinion. I believe he correctly characterized this case as a case about misaligned intentions and expectations between the parties. That's what we have here. And appellants' concern with anybody can just get out of a contract by saying they were promised something. Well, there have to be facts to support that. Anybody can say anything. But the complaint in this case, the operative pleading, has a claim for false promise. It has a claim saying, I agree to be interviewed, to voluntarily be interviewed. That wasn't an involuntary news gathering project. I voluntarily put myself in a position, and I limited the scope of my consent to that agreement to be interviewed to not having my identity be revealed. That is what the case is about. The fact that the trigger of any causes of action arose from the broadcast does not mean that the claim arose from that. And that is exactly what the California courts have held with regard to the conduct and furtherance of exercise of free speech prong of the first prong. So what we have here, the principal thrust of the government, or as Judge Fletcher indicated, what are the guts of this case? The guts of this case are the false promise. You told me my identity would be concealed. There's nothing complaining about any of the substantive content of the interview, anything in the transcripts, anything in the DVDs. We haven't objected to it because it says what it says. That's not the issue. All they had to do was not identify him, and any of that would fine. In fact, there would be no case. We wouldn't be here today if they had simply concealed his identity. And to address the point of what is on the DVD, appellants have made some issue by saying that, well, gee, he posed, he looked at the camera. Well, once you're told that your identity is not going to be concealed, and you come in wearing a bandana, and you're told to take the bandana off because you don't need it, my client's not a television producer. He doesn't know how they're going to conceal his identity. For all he knows, they didn't even need to have a light on in the room, and they did. The video shows there was a light on. So how they went about getting that. Everybody who's seen TV knows how they, you know, they show the body and the face is blurred. I mean, you know, anybody who's watched TV knows that they're capable of doing that in postproduction. Correct. And so my point is the fact that he would look at the camera or pose. They changed the voice. I'm sorry? They changed the voice. Correct. They can do that as well, Your Honor. But the point is my client didn't know exactly how they would do those things. So the fact that he looked at a camera or spoke to them doesn't mean that he somehow waved the right or never had that intent. This goes back to the misaligned intention of the parties. Our client agreed to give this information knowing full well he was putting himself not only at personal risk of life and limb, his livelihood. My client is a 55-year-old ex-con who can't read. He's not exactly readily employable. His manner of earning a living was acting as a police informant. He had dropped out of gang life while he was in prison. He tried to make the best he could out of his life, and he tried to make a living helping the police and basically turning over a new leaf. He sat at this interview because it involved a childhood friend of his who had been murdered. He was paid $300 for this interview, and in exchange he had his livelihood taken away from him. He had his life put at risk. And we submit that a SLAPP statute certainly shouldn't be a basis to preclude that claim. And as Your Honors noted, whether or not the intentions were misaligned, whether or not he should have thought the release said something that it didn't say, those are questions of fact that should be presented to a trier of fact. But on the SLAPP motion, we believe – When was he paid the $300? I believe he was paid in cash, Your Honor. Okay. But when? When? On the spot. He was given the money then. So he was given the money, and then he was added something to sign, and he was told that it was a receipt. That's my understanding. I don't know the exact moment of cash exchange versus signature. That will come out more during the factual development of the case. But my understanding is there was cash given. There was a paper signed. He was told it was a receipt for the money he was receiving. And more importantly, he wasn't given a copy of it. It's not like he could have sat there after the fact and said, well, gee, as I think of this and look at this now. He was told it would be mailed to him later along with a copy of the interview that he could review. Neither one of those things were given to him. In fact, in his declaration, he states he didn't even know this was for the show Gangland. And if you look at the transcript and if you look at the DVD, there's nothing on there identifying this as the program Gangland. My client thought he was doing this for like a scared straight kind of an interview forum where he could educate others on the perils of gang life and what you can try to do to stay out of that and better your life. That was his intention here. And in exchange for all of that, in exchange for the $300, he had his ability to make a living taken away from him. He had his life put in danger. He had skinheads come to his house and threaten him. He had a sign saying, die rat, left on his apartment. He was evicted. I mean, his life was a mess. We have to look at the misaligned intentions and expectations of the parties. And we would submit that the slap statute does not apply in this situation on the first prong because the grovelment of the case arises from that false promise and not from anything in the publication. The broadcast triggered the claim, but the claim arose from the misaligned intentions. Judge Guilford, we believe, got that exactly right. Moving on, if we look at the second portion of the first prong, and that's whether or not it's in connection with a public issue or an issue of public interest, the issue here is not gang life and gang activity. We conceded in our complaint that that's a matter of public interest. Of course it is. The issue is whether or not plaintiff's face is a matter of public interest. And we specifically alleged, and the Court specifically found, that it was not. And we submit that that was a proper finding. And because there was no conduct in furtherance of exercise of free speech, and because it's not in connection with an issue of public interest, meaning his face was not in connection with an issue, that it doesn't even satisfy the first prong. So our position is Judge Guilford was correct. This case shouldn't even get to the second prong to discuss the minimal merits because it doesn't satisfy the first prong in the first instance. But as I indicated, to the extent the Court does, as it's within its right to do on a de novo review, get to the second prong, we believe that there is minimal merit here, that there's nothing showing as a matter of law in any of the declarations or any of the record before this Court that would show that the appellants are entitled to strike the complaint as a slap as a matter of law. We think that that simply doesn't apply in this case. Your Honor, if you have nothing further for me, I'm happy to submit. Thank you. Thank you very much, Your Honor. Being very mindful of the late hour, and I think I have about nine seconds left, I'll be very brief. I'll address just briefly the slap statute. I think I may not need to, but I'll do it very briefly. Under this Court's decision in the Mindy's Cosmetics case, but for the broadcast, there would be no claims here. I think everyone agrees on that. There's no dispute about the standard. The slap, the first part of the slap statute would be satisfied. The focus on the individual depiction as opposed to the broadcast as a whole is contradictory to the statute's express language, which says it only needs to be in connection with a matter of public interest. The program clearly involves a matter of public interest. On the release, I want to say simply that if the Court would look again at the Rosenthal case, the one thing the Supreme Court says, which I think is important, is that if you've had a reasonable opportunity to read the document, despite having someone lie to you about what it says, that that negligence on your own part in failing to read it prevents you from claiming fraud in the inducement and fraud in the execution. There's no explanation here for how the plaintiff was reasonably prevented from reading this document. He merely says she told me it was a receipt. But in Rosenthal, the misrepresentation doesn't get you out of a contract. If you have the reasonable opportunity to read it. He was given the document. He had it in his hands long enough to write his name, his address. That information is all in the document in his handwriting. And his girlfriend, who is apparently able to read very well, was right there. He could have had her read it to him if he was not able to read well enough to see that this one-page document with a heading in all caps that says RELEASED was not, in fact, a receipt. The other circumstances, I think, that the record is pretty clear on what the video says or doesn't say, but the one thing I'll ask the Court to look at, because I think it shows why this was a sham declaration. The plaintiff says, oh, yes, he had me look at the monitor to see what I look like, and I said, okay, but then I said, wait, you've got to make sure that my face is disguised. That's in his declaration. That's not in the videotape. He never, at any point during the interview, ever says, but my face is not going to be shown, right? Even while he's handing them photographs of his face, even while he's letting them videotape close-up his very distinctive tattoos. And he says his friend was identified in this other broadcast because his tattoos were shown, yet he has no concern about having his tattoos videotaped in close-up, handing over pictures of his face and his tattoos. It's simply not consistent with what we believe is a sham declaration. And under Rosenthal and the Hensley case, we think the Court can appropriately reject this 11th hour change of heart in having participated in this broadcast. When did he get the money? I'm sorry? Why was he paid in cash? He was paid for having given the rights to use these photographs, Your Honor. Why cash? I don't honestly know whether it's in the record or not, whether it was cash or not cash. It may well have been. But I don't know the answer to that, Your Honor. Typically, in situations like this, where someone's participating with a program, they don't want a check that they have to go cash. They much prefer to have cash. So he got the cash, did he get the money before he signed that piece of paper? I don't know whether it was simultaneous or whether he signed first and then got the money, Your Honor. It certainly all happened that day when he was interviewed. He was given $300 and he signed a release. After these supposed representations, signed a release that says exactly the opposite of what he says he was told. And then he participated in the interview and his conduct is entirely inconsistent with the representations he says he was given. I think those later acts negate any effect, if any, he says he had believed in a representation that is in dispute. But even assuming it was made, he then signs a document that negates what he says he was told. And he can't get out of that written contract simply by making up an alleged promise. Thank you, Your Honor. Thank you. All right, the matter is submitted.
judges: Pregerson, Fletcher, Nguyen